

FILED
FEB 1 8 2010

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

| | |
|---|---|
| TAMI SMITH, as Personal Representative of the Estate of VELDA SMITH, deceased, | CIV 08-44023 |
| Plaintiffs, | |
| -vs- | MEMORANDUM OPINION AND ORDER |
| GARY BUBAK, M.D., WAGNER COMMUNITY MEMORIAL HOSPITAL, a South Dakota corporation; BUBAK MEDICAL CLINIC; AVERA HEALTH, a South Dakota Corporation; and AVERA SACRED HEART HOSPITAL, | |
| Defendants. | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Defendants, Gary Bubak, M.D. and Bubak Medical Clinic ("Dr. Bubak") have filed a Motion to Exclude the Testimony of a medical expert who has been retained by Plaintiff, Tami Smith, a personal representative of the Estate of Velda Smith. Defendants have also filed a Motion for Summary Judgment which is contingent on their Motion to Exclude Testimony. Defendants Wagner Community Memorial Hospital, Avera Health and Avera Sacred Heart Hospital (collectively "Hospitals"), have also filed a Motion for Summary Judgment. Plaintiff concedes that she does not have a medical expert witness who has stated the Hospitals violated any standard of care, but she argues that Dr. Bubak's alleged negligence should be imputed to the Hospitals under the doctrine of ostensible agency. For the reasons stated below, the Motion to Exclude Testimony and the Motions for Summary Judgment are granted.

## BACKGROUND

This is a medical malpractice case in which Plaintiff alleges Defendants violated the standard of care in their treatment of Velda Smith ("Smith") after she suffered a stroke. Plaintiff contends that Smith should have been transferred to a different medical facility where she could have received tissue plasminogen activator ("tPA") to treat her stroke.

On February 9, 2006, Smith arrived for work at Fort Randall Casino near Pickstown, South Dakota, exhibiting potential stroke-like symptoms. As a result, Smith was transferred by ambulance to Wagner Community Memorial Hospital, arriving at 5:09 p.m., where she was immediately seen by Dr. Bubak. Upon examination, Dr. Bubak noted an obvious left facial weakness and that Smith's blood pressure was 213/100. Smith was unable to tell Dr. Bubak specifically when her symptoms began.

Dr. Bubak started Smith on a medication called Catapres in an attempt to lower her malignant hypertension. Thereafter, additional medications, including IV nitroglycerin, were administered to further treat Smith's significantly high blood pressure. At approximately 5:30 or 6:00 p.m., Dr. Bubak ordered the emergency room nurses to contact and prepare the medical staff at the Douglas Memorial Community Hospital in Armour, South Dakota so that they would be prepared to perform a CT scan on Smith once she was stable enough to transfer there. Wagner Community Memorial did not have a CT scan, and Armour was the closest facility available.

In dealing with a potential ischemic stroke, one of the available treatments is the administration of tPA. The window of opportunity for the administration of tPA in a potential stroke sufferer is limited. It is best if a patient receives tPA treatment within three hours after the onset of symptoms. Dr. Bubak testified that within a half hour to forty-five minutes after Smith's presentation, he determined that she was not a suitable candidate for tPA treatment. Dr. Bubak waited until her condition had stabilized before transferring her by ambulance to Douglas Memorial Community Hospital in Armour at approximately 7:15 p.m. Dr. Bubak was notified at approximately

8:15 p.m. that Smith's CT scan was negative for cerebral hemorrhage, and Smith was transported back to Wagner Community Memorial Hospital where she remained until February 14, 2006.

In the Amended Complaint, Plaintiff alleges that "[a]t no time on February 9, 2006, or thereafter, did Dr. Bubak chart any consideration of transfer, treatment by tissue plasminogen activator (tPA), nor did he discuss any such options with Decedent, her family, significant other or other medical professionals." Plaintiff further alleges that Dr. Bubak breached the standard of care when he allegedly "failed to properly diagnose, treat, care for, or transfer while at Wagner Community Memorial Hospital." Plaintiff alleges that the Hospitals are liable for the alleged acts and omissions of Dr. Bubak under a theory of respondeat superior or apparent agency. Defendants deny all allegations of negligence, proximate cause, and the nature and extent of Plaintiff's damages.

Plaintiff named three experts to testify regarding the standard of care allegations set forth in Plaintiff's Complaint: James R. McDowell, M.D., John C. Owens, M.D., and Jerry Walton, M.D. Dr. Owens is an emergency medicine doctor. In his opinion letter dated December 8, 2008, Dr. Owens lists five violations of the standard of care for emergency practice which he believes Dr. Bubak violated. During Dr. Owens' deposition on March 6, 2009, he was asked about each one of the five violations. Dr. Owens would not state whether any of the violations affected Velda Smith's outcome. Instead, he opined that, had Dr. Bubak not violated those standards, he would have been prompted to transfer Velda Smith so she could get tPA. Thus, Plaintiff has failed to establish causation in regard to the alleged violations of the standards of care listed by Dr. Owens' letter unless there is a better than even chance tPA would have improved her outcome, and Dr. Owens deferred to Dr. McDowell on that issue. Like Dr. Owens, Dr. Walton said that Dr. Bubak should have transferred Smith to a facility where tPA could have been administered, and he also deferred to Dr. McDowell regarding the efficacy of tPA. Dr. Walton is a family practice physician. In his opinion letter dated December 3, 2008, Dr. Walton also opined that Dr. Bubak violated the standard of care "by lowering the blood pressure too rapidly, thus contributing to increased cerebral ischemia which can enhance tissue damage." Dr. Walton backed away from this opinion in his March 31, 2009 deposition:

3

> So, I'm not going to testify as to the way in which he lowered the blood pressure. But what I would testify to is the untimeliness, his deferring sending her anywhere because of her hypertension until he though he had it under control.

(Walton depo., p. 45.) The doctors' depositions reveal that the opinions of Dr. Owens and Dr. Walton that Dr. Bubak was negligent all are contingent upon Dr. Bubak's failure to transfer Smith to a place where she could get tPA, and they both defer to Dr. McDowell regarding causation. There is no indication in the record that anything else Dr. Bubak did or failed to do caused an injury within a reasonable degree of medical probability. Thus, Dr. McDowell's opinion is the key to whether Plaintiff's case survives summary judgment.

Although each of Plaintiff's three experts has alleged that Dr. Bubak was negligent in failing to transfer Smith to a facility with the capability to administer tPA, only one, Dr. James McDowell, has offered the opinion that this decision would have given Smith a better-than-even chance of avoiding her injuries. Dr. Bubak asserts that Dr. McDowell's opinion is based upon an unreliable mathematical determination which has been rejected by other courts and is not admissible in this action. Thus, according to Dr. Bubak, Plaintiff cannot meet her burden under South Dakota law of providing reliable expert testimony to establish the element of causation.

Dr. McDowell is a practicing neurologist and has been board-certified in Psychiatry and Neurology since 1976, obtaining board certification in the subspecialty of Vascular Neurology in 2006. He completed a three-year Neurology Residency in 1974 at the University of Washington Hospital and has been a practicing Neurologist since 1976. Since 1974, Dr. McDowell's hospital appointment has been at St. Peter Hospital in Olympia, Washington, at which he has served as President of Medical Staff, Chairman of Medical Section and currently serves as the Medical Director of Neurophysiology and Medical Director of the Stroke Program. He also has consulting privileges at Capitol Medical Center and Mason General Hospital, Harborview Medical Center, and at Providence Centralia Hospital. For over thirty years, Dr. McDowell has been assessing, diagnosing and treating strokes, as well as lecturing, authoring publications and participating in

4

stroke research as a principle investigator. Defendants do not challenge Dr. McDowell's qualifications to render an opinion in this case.

The parties agree that the 1995 National Institute of Neurological and Communicative Disorders and Stroke study ("1995 NINDS study") represents the gold standard for questions regarding the effectiveness of tPA therapy for patients suffering an acute ischemic stroke. Its test design includes a control group (placebo) and a test group (tPA). It was a randomized, double-blind trial. Neither the patient nor the administering physician was aware of whether tPA or a placebo was administered. The sample size was sufficient to control for confounding factors such as age, gender, location, etc. As a result of this design, the two groups are statistically identical, except for the use of tPA. A data set was created from the clinical test methodology. The method used to generate this data set is not challenged by Plaintiff or Defendants, nor is the data set itself. The results of the study are discussed in *Tissue Plasminogen Activator for Acute Ischemic Stroke*, THE NEW ENGLAND JOURNAL OF MEDICINE, Vol. 333:1581-1587 (December 14, 1995) ("the 1995 paper"). As shown in Figure 2 of the 1995 paper, modified Rankin scale ("mRs") scores of 0-1 are considered the "favorable outcome" subcategory. Twenty-six percent of patients who received the placebo, and 39 percent who received tPA, had a "favorable outcome." It was reported that tPA, when initiated within three hours of the onset of stroke symptoms, provided an absolute increase in favorable outcome of 11 to 13 percent.

Dr. Bubak's expert, Paul Nyquist, M.D., is an assistant professor of Neurology, Anesthesiology/Critical Care Medicine, and Neurosurgery at Johns Hopkins School of Medicine. Dr. Nyquist is aware of no peer reviewed studies which document that 50 percent or greater of patients with stroke will improve when tPA is administered. He refers to the results of the 1995 NINDS study which shows that patients who are given tPA showed an absolute improvement rate of 12 percent. He states that this study is considered the gold standard of studies on this subject.

Dr. McDowell testified at his deposition that 58 percent of patients have a better outcome with tPA treatment. Dr. McDowell stated that 19 percent of patients who receive tPA are one grade better than they would be without. Dr. McDowell added to this 19 percent the "absolute 13 percent of people who are normal, grade zero to one," thus equaling a total of 32 percent. Finally, Dr. McDowell added to this 32 percent the 26 percent of placebo patients who do well without tPA, for a total of 58 percent. When asked to explain why he added the results of the placebo group to the overall percentage, Dr. McDowell said, "I'm saying they're equal. People do well either way...."

After his deposition, Dr. McDowell provided Defendants with several research articles he relied upon for his opinion, including *Review of Tissue Plasminogen Activator, Ischemic Stroke, and Potential Legal Issues*, published in Arch Neurol. 2008; 65 (11) 1429-1433 ("the Zivin paper"). The authors of the Zivin paper also add the placebo group (the patients who return to normal spontaneously without tPA) to the patients who derive some benefit from tPA in order to determine the increased benefit attributable to tPA:

> Adding these numbers together, the data show that the conditions of 26% of patients return to normal spontaneously while the conditions of an additional 13% return essentially to normal if treated with tPA (see Figure 1). Furthermore, another nearly 19% derive some lesser but clinically meaningful benefit from the tPA treatment. . . . Hence, the conditions of a total of about 58% of the patients are either normal or improved with tPA.

The Zivin analysis was criticized in a letter written by Lansberg & Schwartz which appeared in ARCHIVES OF NEUROLOGY, Vol. 66, No. 4 pp. 540-541 (April 2009):

> Liang et al, in their review of legal issues related to intravenous tissue plasminogen activator (tPA), make the point that tPA "is efficacious and can result in highly improved outcomes for a majority of eligible patients." Although tPA results in improved outcome, it unfortunately does so in only a minority of cases. The percentage of patients who experience benefit depends on the chosen efficacy measure. This percentage, however, lies well below the 50% mark for all relevant measures. When considering the traditional efficacy measure of a favorable outcome, namely a modified Rankin Scale score of 0 or 1 at 90 days, only 13% of patients with stroke treated with tPA benefit. This is based on data from the National Institute of Neurological Disorders and Stroke trial in which 26% of placebo-treated patients achieved this outcome vs 39% of tPA-treated patients. Similarly, the pooled analysis of all major tPA stroke trials demonstrates that tPA treatment within 90 minutes after

6

> stroke onset benefits only 12% of patients (29% having a favorable outcome with placebo vs 41% having a favorable outcome with tPA).
>
> Favorable outcome as defined earlier relies on dichotomization of the modified Rankin Scale score between excellent (score of 0-1) and poor (score of 2-6) outcomes. Such dichotomization leads to an underestimation of the true treatment effect as only changes between 2 outcome categories are accounted for, whereas shifts within an outcome category are not. For example, a patient who shifts from a modified Rankin Scale score of 4 to a modified Rankin Scale score of 2 as a result of tPA treatment is not accounted for as having a favorable outcome using this technique. To address this limitation, Saver has reported on the efficacy of tPA when shifts over the entire spectrum of clinical outcomes are considered. Based on this analysis, 32% (95% confidence interval, 28%-38%) of patients with stroke benefit from tPA.
>
> Thus, regardless of effect measure or method of analysis, only a minority of patients with stroke who are treated with tPA experience a benefit from that treatment. Development of new stroke therapies will hopefully increase the overall proportion of patients with stroke who have improved outcomes as a result of acute care treatment. Until such time, we need to realistically inform our patients and their families that although tPA therapy is quite helpful for some, at most about one of every three eligible patients with stroke benefits from tPA.

The Zivin paper includes its authors' own independent re-analysis of the data from the 1995 NINDS study using a separate Wilcoxon test. This resulted in a conclusion that 57.3 percent of patients treated with tPA improved to some extent. Plaintiff argues that this is a mathematically valid statistical analysis of the data, but Plaintiff admits that all patients were included in this re-analysis, including the 26 percent of patients who improved without tPA. (Doc. 112, p. 10.)

The Court was concerned with including the 26 percent of patients who improved without tPA, so the Court issued an Order directing the parties to focus their arguments at the upcoming motions hearing on the re-analysis of the NINDS data in the Zivin paper. (Doc. 95.) The Court stated that it considered it a "methodological defect" to include the 26 percent of patients who would have improved without tPA in the final percentage of people who improved as a result of receiving tPA. Prior to the hearing, Plaintiff filed a written response to the Order which included an Affidavit

of Dr. Zivin. (Doc.99-2.) In his affidavit, Dr. Zivin explained his position that inclusion of the 26 percent of patients who improve spontaneously is required by medical research standards. He added:

> If the legal standard is that medical research is fatally defective if it does not identify the percent of patients benefitting from tPA treatment, but includes both patients benefitting from tPA treatment and patients spontaneously recovering, without benefit of treatment, thus rendering the research inadmissible in court, then the legal standard is inconsistent with the standards, practices, and methodologies of medical research.

(*Id.* at ¶ 15.)

The Court heard extensive argument from Plaintiff on the issue of including the 26 percent of patients who improved spontaneously, and then allowed the parties to submit supplemental materials after the hearing.

## DISCUSSION

Under Rule 56(c) of the Federal Rules of Civil Procedure, "summary judgment is appropriate when the evidence, viewed in a light most favorable to the non-moving party, demonstrates that there is no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law." *Clark v. Kellogg Co.*, 205 F.3d 1079, 1082 (8th Cir. 2000). To oppose summary judgment successfully, Plaintiff "must show that admissible evidence will be available at trial to establish a genuine issue of material fact." *Churchill Business Credit, Inc. v. Pacific Mutual Door Co.*, 49 F.3d 1334, 1337 (8th Cir. 1995).

In support of his Motion for Summary Judgment, Dr. Bubak argues that the proposed testimony of Dr. McDowell is inadmissible and will thus be unavailable to show causation at trial.[1] Plaintiff does not point to any other evidence in support of her theory that Smith had a better than

---

[1] It is well-settled law in South Dakota that negligence in medical malpractice cases must be established by the testimony of medical experts unless the subject of the testimony is "within the common knowledge and comprehension of persons possessed of ordinary education, experience and opportunity." *Magbuhat v. Kovarik*, 382 N.W.2d 43, 46 (S.D. 1986). The expert testimony requirement applies not only when establishing alleged deviations from the standard of care, it also applies when proving the essential element of causation. *Lohr v. Watson*, 2 N.W.2d 6 (S.D. 1942).

50 percent chance of recovering if Dr. Bubak would have administered tPA,[2] but simply argues that the opinion of Dr. McDowell is admissible at trial. Accordingly, if Dr. McDowell's testimony is inadmissible the Court must grant summary judgment in favor of the defendants in this case.

The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence.[3] Before admitting scientific testimony under this Rule, a district court must find that "the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to determine a fact in issue." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592-93 (1993). Under this standard, in determining whether a theory or technique is scientific knowledge, courts should consider:

> (1) whether the theory or technique can or has been tested; (2) whether it has been subjected to peer review and publication; (3) the known or potential rate of error of the technique; and (4) general acceptance among the scientific community.

---

[2] The loss of chance doctrine was rejected by the South Dakota Legislature. In *Jorgenson v. Vener*, 2000 S.D. 87, 616 N.W.2d 366, the South Dakota Supreme Court described the loss of chance doctrine as "the idea that a doctor, by doing something wrong, has decreased the patient's chance of recovery or survival." *Id.* ¶ *12.* In adopting the doctrine, the Court agreed with those proponents of the doctrine who argued that any chance of recovery, no matter how small, is a legally cognizable interest even though the chance of recovery may be less than 50 percent. *Id.* Shortly after the *Jorgenson* decision, however, the South Dakota Legislature specifically abrogated application of the so-called "loss of chance" doctrine under South Dakota law and the *Jorgenson* decision itself. SDCL § 20-9-1.1 (abrogating *Jorgenson v. Vener,* 2000 S.D. 87, 616 N.W.2d 366.). As such, under present South Dakota law, an injury is not compensable unless expert testimony establishes that there existed a better-than-even chance of avoiding the physical injury or resulting death if the alleged negligence had not occurred.

[3] Rule 702 provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

*United States v. Davis*, 103 F.3d 660, 673 (8th Cir. 1996) (citing *Daubert*, 509 U.S. at 593-94). The Supreme Court has emphasized that this inquiry is "a flexible one," whose "overarching subject is the scientific validity – and thus the evidentiary relevance – of the principles that underlie a proposed submission." *Daubert*, 509 U.S. at 594-95. The burden of establishing that the proposed testimony meets the standards of Rule 702 is on the proponent of the expert opinion. *See Wagner v. Hesston Corp.*, 450 F.3d 756, 758 (8th Cir. 2006).

The Court believes that Dr. McDowell is qualified to testify regarding the efficacy of tPA. But the question is whether his opinion that Smith had a better than 50 percent chance of recovering had she received tPA is reliable. The Court will apply the four *Daubert* factors in the order they are listed above. First, Zivin's statistical methods, and Dr. McDowell's opinion based thereon, are not theories or techniques that can be tested. Rather, they are ways of analyzing data gathered from an earlier study. This weighs against the reliability and admissibility of Dr. McDowell's opinion. Second, Zivin's article was peer-reviewed and publicized, which weighs in favor of admissibility. Third, the Court has not been made aware of any known or potential rate of error, weighing in favor of precluding Dr. McDowell's testimony.

That brings the Court to the fourth factor that *Daubert* teaches us to consider: general acceptance among the scientific community. Although Plaintiff argues that the Zivin paper takes a "different perspective" on the data set obtained from the 1995 NINDS study, Plaintiff does not suggest that it is the preferable means of analyzing the data to determine how many stroke patients improve with tPA. Dr. Zivin states in his affidavit that inclusion of the 26 percent of patients who improved without tPA was required for his re-analysis of the 1995 NINDS data under the Wilcoxon test. Dr. Zivin says the Wilcoxon test is an "accepted statistical analysis methodology," but he does not indicate that it is the generally accepted method for determining the percentage of patients who recover with tPA.[4] The Wilcoxon test used by Zivin may be a scientifically sound statistical method

---

[4] Even if Dr. Zivin's affidavit could be interpreted as an assertion that application of the Wilcoxon test to the 1995 NINDS study data is generally accepted, an expert's self-serving assertion that his methodology is generally accepted will not withstand a *Daubert* analysis. *Daubert*

10

for analyzing data, but there is nothing in the record showing that the statistical methodology employed by Dr. Zivin enjoys the same level of acceptance as the methods used in the 1995 study and the 1995 paper when it comes to determining the percentage of patients who improve with tPA.[5] The Court concludes that Zivin's re-analysis of the 1995 NINDS study data does not represent a generally accepted methodology for determining the efficacy of tPA treatment.

Even if it were a generally accepted methodology for medical purposes, that does not change the better than even chance of improvement that is a requirement under South Dakota law as a result of the South Dakota legislature passing SDCL § 20-9-1.1 and abrogating *Jorgenson v. Vener*. If the "loss of chance" doctrine were still the law in South Dakota, then this case would proceed on to trial as even after deducting those that would spontaneously recover, there is still a percentage that could either recover partially or completely as a result of tPA use.

It does not help Plaintiff's position that, during his deposition, Dr. McDowell could not explain why the 26 percent of patients who did not receive tPA was added to his final percentage of patients who improved with the use of tPA. That was one of the first red flags regarding admissibility of his testimony at trial. The answer was still unclear after oral argument, even though the Court had directed the parties to focus on that issue. Plaintiff's supplemental brief submitted after oral argument, although well-researched and well-written, still has left doubts about the reliability of Dr. McDowell's opinion.

---

*v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1319 (9th Cir. 1995) (*Daubert II*) ("[P]laintiffs rely entirely on the experts' unadorned assertions that the methodology they employed comports with standard scientific procedures.... We've been presented with only the experts' qualifications, their conclusions and their assurances of reliability. Under *Daubert* that's not enough.").

[5] There is evidence in the record to support Dr. McDowell's adding the 19 percent of patients who receive tPA and are one grade better than they would be without tPA to the absolute 13 percent of people who are normal after receiving it, equaling a total of 32 percent. Defendants do not dispute this calculation.

In *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999), the Supreme Court found that the exclusion of a qualified tire expert's use of visual and tactile examination of automobile tires was within the trial court's discretion, despite the fact that this methodology was generally accepted within the relevant field. *See id.* at 153-157. In so holding, the Court found that it was not the general acceptance of the methodology that was relevant, "[r]ather, it was the reasonableness of using such an approach, along with [the expert's] particular method of analyzing the data thereby obtained, to draw a conclusion regarding the particular matter to which the expert testimony was directly relevant." *Id.* at 154. Because the Court found that the research method did not satisfy the four *Daubert* factors, and was not a reliable indicator of the results to which the expert would testify, it upheld the exclusion of the testimony. *See id.* at 155-57.

This case is somewhat analogous to *Kumho*. Dr. Zivin used a method of analyzing data which is recognized within his field, but that method should not blindly be used to prove legal causation without considering the variables that could affect the results of Dr. Zivin's analysis. The causation opinion of Dr. McDowell, which is based on the Zivin article, is based upon a technique for analyzing data which includes stroke patients who improved spontaneously. Because Dr. McDowell includes 26 percent of patients who improve without tPA, Dr. McDowell's testimony is unreliable for the proposition that more than 50 percent of patients would improve with the use of tPA. Thus, Dr. Bubak's motion to exclude that part of Dr. McDowell's testimony must be granted.

Several courts have considered issues similar to those currently before this Court and have rejected similar testimony regarding the chances of patient improvement with tPA treatment. *See, e.g., Young v. Memorial Hermann Hosp. System*, 573 F.3d 233 (5th Cir. 2009) (affirming district court's grant of summary judgment for defendants based on plaintiff's lack of reliable causation testimony that tPA benefits greater than 50 percent of patients who receive it). *See also Ensink v. Mecosta County General Hosp.*, 687 N.W.2d 143 (Mich. App. Ct. 2004). In *Ensink*, the court affirmed dismissal of a medical malpractice plaintiff's claim because he could not show as a matter of law that the opportunity to achieve a better result had an emergency physician treated him with tPA within three hours after occurrence of his stroke exceeded 50 percent. *Id.* The plaintiff's expert

provided an opinion that failed to subtract those patients who would receive a benefit without tPA from the overall percentage of those patients who the expert claimed gained a benefit from the treatment:

> If plaintiff had a twenty percent chance of complete recovery without t-PA, under the *Fulton* majority's interpretation, that 'without negligence' percentage should be subtracted from the anticipated improvement with t-PA because that would be the opportunity to achieve a better result that was lost. Dr. Levine estimated that totaling the cure rate with the additional anticipated fifty percent of the remainder "some improvement" percentage would give a total of sixty-five percent that could have obtained "some degree of improvement up to a full cure." However, per *Fulton*, subtracting the twenty percent cure rate without t-PA (and not even accounting for the "some improvement without t-PA rate") would give a lost opportunity to achieve a better result of forty-five percent. Because that is less than fifty percent, pursuant to the *Fulton* majority's interpretation of M.C.L. § 600.2912a(2), the trial court should have granted summary disposition to defendants . . .

*Id.* at 155-56.

Striking Dr. McDowell's testimony in the present case on *Daubert* grounds compels granting summary judgment for the defendants because all of Plaintiff's claims are premised on Dr. Bubak's failure to administer tPA, and Plaintiff has failed to present reliable expert medical testimony that had Smith been treated with tPA she would have had a greater than 50 percent chance of receiving a benefit. Accordingly,

IT IS ORDERED:

(1) that the Motion to Exclude Testimony of James R. McDowell, M.D. (Docket No. 70) is granted;

(2) that the Motion for Summary Judgment by Gary Bubak, M.D., and Bubak Medical Clinic (Docket No. 72) is granted; and

(3) that the Motion for Summary Judgment by Wagner Community Memorial Hospital, Avera Health, and Avera Sacred Heart Hospital (Docket No. 64) is granted.

Dated this 17th day of February, 2010.

BY THE COURT:

*Lawrence Piersol*
Lawrence L. Piersol
United States District Judge

ATTEST:
JOSEPH HAAS, CLERK

BY: *Jackie Meisenheimer*
(SEAL)     DEPUTY